## THE BANK OF THE COMMONWEALTH *vs.* VAN VLECK and TUCKER.

Where the plaintiffs loaned to the defendants $10,000 in gold, and the latter agreed to repay the loan in gold, and repeatedly, afterwards, promised to return gold to that amount; *Held* that the act of congress, commonly called the legal tender act, did not apply to the transaction; and that the plaintiffs were entitled to damages for a breach of the contract in not returning the $10,000 in gold.  (WELLES, J. dissented.)

*Held, also,* that the plaintiffs had not released the defendants from the obligation of the contract, by receiving from the latter their check for $10,000, on which they received the money in legal tender notes, crediting the check to the defendants in their general account; where it appeared that the check was received as a deposit, like any other deposit, and that the plaintiffs did not intend, by receiving it, to satisfy or discharge the defendants' obligation under the contract.

Where a person, since the passage of the legal tender act, promises, for any valid consideration to return gold or silver, instead of the national currency, he is bound to return those specific things, precisely as he would be bound to return a specific quantity and quality of cotton, if he had, for a valid consideration, promised to do so.  *Per* CLERKE, J.

THIS action was brought to recover damages for a breach of contract.   The complaint alleged, 1. That the plaintiff at the several times hereinafter stated was, and ever since has been, and still is a body corporate, created by and under. the laws of the state of New York; duly organized, pursuant to an act of the legislature, entitled "An act to authorize the business of banking," passed April 18th, 1838, and the acts amending the same, having their banking, house and place of business in the city of New York.   That on the

1st day of September, 1862, at the city of New York, the defendants were, and for some time previous thereto had been and ever since have been and remained, and still are co-partners in trade and business as bankers and brokers, having their office and place of business in said city of New York, and during the time aforesaid, said defendants as such co-partners have done business with, and have kept a bank account with said plaintiffs, the Bank of the Commonwealth. That on or about the 1st day of September, 1862, at the city of New York, and while said defendants were such co-partners as aforesaid, and while keeping a bank account with said plaintiffs as aforesaid, the defendants entered into an agreement with the plaintiffs in substance as follows, that is to say : that if the plaintiffs should and would loan and advance to the defendants, for the term of a few days, the sum of ten thousand dollars in gold coin, that the defendants would deposit with said plaintiffs the said defendants' check for the sum of $10,000 upon the said Bank of the Commonwealth, against any funds which said defendants then had, or might thereafter have in said bank, payable in the currency of the United States, commonly called legal tender notes, as security for the return of said sum of $10,000 in gold coin. And that said defendants would, within a few days then next thereafter, and upon demand, return to said plaintiffs the said sum of $10,000 in gold coin as aforesaid. And thereupon in consideration thereof the plaintiffs did then and there loan and advance to said defendants, to be returned as aforesaid said sum of $10,000, in gold coin, and took from said defendants as security therefor their check for the sum of $10,000 payable in currency or legal tender notes as aforesaid. And the defendants then and there accepted and received the said sum of $10,000 in gold coin upon the terms above specified. And in consideration thereof then and there undertook, promised and agreed to, and with the plaintiffs, that they, the said defendants, would, within a few days, and at any time upon demand, return to said plaintiffs the

said sum of $10,000 in gold coin as aforesaid. And the plaintiffs further alleged that at the time of the loan and advance of said gold as aforesaid, the same was actually, and in fact, worth much more than its par value, to wit, a premium of from seventeen to twenty cents on each and every dollar thereof, over and above its nominal par value in legal tender notes, and soon thereafter the value of said gold coin became, and was greatly enhanced, and the same was actually worth, and readily sold for a premium of seventy-two cents on each and every dollar thereof, amounting in the aggregate to the sum of $17,200. And the said check of said defendants was not then, nor has it at any time since been worth any more than $10,000 in the paper currency of these United States, commonly known as legal tender notes. That soon after said 1st day of September, 1862, and at divers times since then, the plaintiffs by themselves and their duly authorized agents, have duly demanded of said defendants the return of said sum of $10,000, in gold coin, pursuant to the terms of the aforesaid agreement on the part of said defendants ; and the defendants, from time to time, upon such demands as aforesaid, acknowledged their obligation to return the same, and from time to time promised so to do, but asked for a few days further time in which to make such return, which was accorded them upon such renewed promise to return the same, till on or about the 18th day of December, 1863, when the plaintiffs caused an absolute demand to be duly made upon said defendants for the return of said gold coin ; that at the time of said demand as last aforesaid, the said gold coin was actually, and in fact, worth the sum of $17,200 in the paper currency of these United States, commonly called and known as legal tender notes. And the plaintiffs then might, and could have realized and received for the said sum of $10,000 in gold coin, if said defendants had kept and performed their said agreement in respect to said return thereof, the just and full sum of $17,200 in the paper currency of the United States as aforesaid ; but the defendants have wholly

neglected to return the same or any part thereof, and now wholly refuse to return the same or any part thereof, contrary to the form and effect, true intent and meaning of their said contract, or to pay or give said plaintiffs any other or greater sum or consideration therefor, than the aforesaid check of $10,000 ; to the damage of said plaintiffs of said sum of $7200 over and above the amount of said check. Wherefore, the plaintiffs demanded judgment against the defendants as such co-partners as aforesaid, for said sum of $7200, and interest thereon, besides costs.

The defendants, by their answer, admitted that they were partners in the banking business, as alleged in the complaint ; that they had for a long time dealings with the plaintiffs, and kept a bank account with them, and they alleged that before or soon after the commencement of the plaintiffs' action, and before the making of this answer they had settled with the said plaintiffs in full ; that their account was balanced and closed, and the plaintiffs paid over to them the balance due to them, and all matters as between the plaintiffs and the defendants were fully settled and adjusted. They denied that any contract, such as set forth in the complaint, was ever made with the defendants, or that they are liable upon any contract or arrangement at any time made with the plaintiffs, or that any contract ever made by the defendants with the plaintiffs by them remains unperformed. And they averred that if the plaintiffs ever paid any check of theirs in gold in place of currency, it must have been at a time when the plaintiffs were indebted to the defendants, and that in case any such payment was ever so made by the plaintiffs, it was not so made on any contract or assurance upon the part of the defendants that they would re-deposit with said plaintiffs the same amount at some future time, in gold ; and the defendants denied that they ever made any promise or assurance whatever to the plaintiffs to return to them any gold that was not so returned, long before this action was commenced. And they denied that by reason of any obligation in the com-

plaint contained, the plaintiffs had any cause of action against them, or that they were liable to the plaintiffs in any sum whatever, as damages, or otherwise. Wherefore they demanded that the plaintiffs' complaint be dismissed, and for judgment against said plaintiffs, and for the costs and disbursements of this action.

The action was, by consent of parties, tried before Justice J. F. BARNARD and a jury. The justice found the following facts, viz : That the plaintiffs are a banking corporation duly organized under the laws of the state of New York ; that on the first day of September, 1862, the plaintiffs loaned to the defendants $10,000 in gold ; that defendants agreed to repay said loan in gold ; that the premium on gold was then 17 per cent ; that on or within a few minutes after the loan the defendants delivered to the plaintiffs their check in the usual form of bank checks, and not specifying that the same was payable in gold, for $10,000 ; that the plaintiffs received the money on said check on presentation of the same, in legal tender notes of the United States ; that the defendants have repeatedly, since said loan to them, promised to return gold to the amount of said loan, and have never done so ; that the highest premium upon gold since the loan, and before this trial has been 185 per cent, which was on the .. day of ... 1864 ; that on the 9th of December, 1865, the defendants directed the plaintiffs to write up their bank book, with a view to close the account of the defendants with said bank ; that this was done, and there was a balance of about $700 due the defendants, for which they drew their check, and the same was paid by the plaintiffs. That the $10,000 received upon the defendants' check for said loan, was retained by the plaintiffs, and the defendants' check for balance, was for balance due the defendants over and above the $10,000 check given upon said gold loan. That the account so settled was made up exclusively of the defendants' deposits on one side, and the drafts against these deposits on the other, and did not include any charge of gold or premium

Bank of the Commonwealth *v.* Van Vleck.

on gold, to the defendants; that the settlement of the accounts consists solely in writing up the defendants' pass book, ascertaining the balance of deposits over drafts, by the book-keeper of the bank, in the ordinary course of business, and the payment by the bank of the defendants' check for said balance in the ordinary course of business, and that there was no notice taken of said loan in said settlement between the plaintiffs and the defendants beyond the charge of said $10,000 checks to the defendants' account. That after the payment of said balance on said checks, to wit, on the 18th December, 1863, the cashier demanded the return of the gold, and the defendants promised to return it. That after the commencement of this action, to wit, in the month of September, 1865, the defendant Van Vleck, again acknowledged it, and promised to adjust the defendants' liability on said gold loan. That the plaintiffs appropriated and held the $10,000 drawn by, and the proceeds of said check of the defendants, but did not intend thereby to satisfy or discharge the defendants' obligation under the contract by which said gold was borrowed.

And his honor found as conclusions of law, from the above facts, that the plaintiffs were not entitled in law to recover any premium upon said gold loaned; that the loan was legally repaid to said bank, and that the defendants were entitled to recover the costs against the plaintiffs in this action. And that the defendants were entitled to judgment therefor, with one hundred dollars commission.

The plaintiffs' counsel excepted to each of such conclusions of law, and judgment being entered, the plaintiffs appealed to the general term.

*J. M. Van Cott* and *E. A. Doolittle,* for the appellants. I. The plaintiffs concede that an ordinary debt can be discharged by a payment in legal tender notes.

II. Gold coin and notes are not legally identical, except in cases of pure debt, or where they are made so by express con-

tract. 1. One who tortiously converts 1000 ten dollar gold pieces when gold is at a premium, is liable to the owner for the actual *market value of the gold.* And gold *coin* and gold in *bars* would be governed by the same rule. 2. So on a *sale* of a bag of gold, the purchaser in an action for non-delivery, would recover *its market value.* 3. So on an *exchange* of a bag of ten dollar gold coins for a bag of five dollar gold coins, and a delivery by one party and a failure to deliver by the other, the latter would be liable for the *value* of the gold. So on a sale of exchange, on non-performance, the buyer can recover the market value.

III. Contracts based upon the different values of gold and paper money, under which gold is delivered by one party on an express agreement made by the other party, to return gold, or the *value* of gold in some other medium of payment ; for example, in grain, or flour, or exchange, are not within the letter or policy of the legal tender act. The federal legislation recognizes the distinction between gold and paper money. It provides for the payment of some federal debts in gold. It also provides that certain dues to the government shall be paid only in gold. This federal legislation created the necessity for the purchase and sale of gold, to buy its own gold bearing securities and to pay the dues to itself which gold alone could discharge. It necessarily results, that contracts to buy and sell gold are lawful ; and that they are to be construed and enforced like other contracts, according to their import and the intentions of the parties. It would be monstrous to say, that the merchant must buy gold to pay his dues to the government, but that he is not bound to pay the seller its stipulated price. If a party were to borrow gold on his stipulation to return it in kind, with a secret intention not to repay it except in a depreciated paper medium, the common moral judgment of mankind would stigmatize him him as a knave. The federal statutes were not designed to legalize such knavery.

IV. The distinction insisted upon between ordinary debts,

and contracts based upon an existing and notorious difference in the value of gold and of paper, has been recognized in various cases. ` (*Luling* v. *The Atlantic Mutual Ins. Co.,* 45 *Barb.* 510. *Rodes* v. *Bronson,* 34 *N. Y. Rep.* 649, 653, 656. *Taylor* v. *Ketchum, N. Y. Times, Feb.* 23, 1847.)

In *Luling* v. *The Atlantic Mutual,* this court held, that where policies were issued for gold premiums, and stipulated for payment of losses in gold, the transaction and all its incidents were taken out of the legal tender act. In *Taylor* v. *Ketchum,* bankers were held by the Superior Court for the *value* of gold deposited by a customer. In *Rodes* v. *Bronson,* the Court of Appeals, in applying the legal tender act to a mortgage made in 1861, when gold and bank paper were equivalent convertible values, carefully distinguishes the case of an express contract to pay gold, made when gold and paper money were of unequal values. "The case of an agreement made since the act of 1862, for the payment of a specified sum *in coin,* in consideration of a loan in coin, or upon any other equivalent consideration, and in view of the difference in *market* value existing at the time between coin and treasury notes having the same *legal* value, may differ materially from the present case. The validity of such an agreement, for some purposes at least, is distinctly recognized by the act itself, and, in many cases, contracts of that character may accord with, and even aid, the policy of the statute."

V. Substantially, this transaction was the loan of a *commodity* on an agreement to return it *in kind,* and for the breach of that agreement the borrower is liable for the *market* value of the commodity wrongfully withheld.

*B. F. Sawyer,* for the respondents. I. Admitting the allegations in the plaintiffs' complaint to be true, they cannot recover for the following reasons, viz: 1. That said bank by the terms of the general law under which they became a body corporate were bound to *redeem their bills and pay off their indebtedness* to their depositors in their own bills or

*specie,* and such bills were at all times *immediately convertible into specie.* 2. That the plaintiffs, having suspended specie payments, contributed to the enhancing or the creating of a speculative value for gold coin, and induced the premium on the same. That such suspension of specie payments was without warrant of law, and has never been legalized, and the plaintiffs ought to be estopped from claiming any profit or benefit resulting from *their own wrong or illegal act.* 3. That it is not within the power or authority conferred upon a bank to speculate in gold or silver coin. They can own it, or receive it on deposit, but it is of no greater value than their own bills ; both are presumed to be of par gold value, *and in paying out such coin upon an indebtedness they cannot demand or receive a premium.*

II. The plaintiffs admit that when they delivered or paid to the defendants $10,000 in gold coin upon their check they (the plaintiffs) received of the defendants after such delivery $10,000 in the legal tender currency of the United States for the same. Such notes by act of congress are made equal to gold or silver, and are made legal tender for the purpose of paying off any indebtedness, except "*custom dues,*" or bonds and coupons payable in gold.

III. Had no such payment been made in legal tender notes for said $10,000 of gold coin, and the bank had subsequently brought suit for the same, a tender of the amount at par in the legal tender notes of the government would, in point of law, have discharged the debt, and operated as a bar to the right of the plaintiff to have recovered a larger sum. It would have been simply an indebtedness for $10,000, and as such $10,000 in legal tender currency would have discharged it—*the value of each being the same by act of congress.*

IV. It is difficult to conceive upon what principle this court can make any distinction between the two kinds of money, as the act of congress has fixed their value and made legal tender notes as valuable, dollar for dollar, as gold.

V. What amount of such *legal tender notes* a party might have obtained for $10,000 in gold coin, September 1, 1862, or December 31, 1863, by a sale or exchange of the same in the market, has nothing to do with the case at bar, for the reason that the defendants never proposed to purchase gold at the market price payable in currency, or the plaintiffs to sell the same. The defendants, at most, got of the bank $10,000 in gold coin upon their check drawn upon the plaintiffs' bank for a like sum payable in legal tender notes, which they (the defendants) had on deposit with the plaintiffs, and the plaintiffs received the same ; which was, in fact, full payment.

VI. If the plaintiffs were ever entitled to recover at all, they could not in the manner and form set out in their complaint, for the reason that they sue for a difference or premium in gold coin over and above legal tender notes, and by the law of the land no such difference or premium exists. If any action could have been maintained upon the contract, as they have alleged in their complaint, and upon their own showing, they should have tendered to the defendants the $10,000 of legal tender currency, and demanded a return of said gold coin, and, on the defendants' refusal, brought an action for the return of the same ; *for a specific performance of said contract, i. e. a return of said gold.*

VII. The fact that the defendants' account was settled in the usual and ordinary manner of settling such accounts, does not help the plaintiffs. Had this settlement taken place between merchants, in their usual and ordinary way, neither party, in such a case as the one at bar, could have recovered as against the other.

VIII. This case is not analogous to the one cited by the counsel for the plaintiffs on the trial of this action, for the reason that it was based upon a contract made with a broker or dealer in gold who made a specific contract in writing for the purchase of gold and for the delivery of the same. *Here there is no pretense of sale or purchase.* The plaintiffs, as they allege, lent $10,000 in gold, to be returned, and fifteen

minutes after received $10,000 in legal tender notes of the United States, which were by act of congress of equal value. The two cases are wholly unlike.

IX. If the plaintiffs had regarded that $10,000 gold coin as a loan, and they had a legal right to claim the same, or the premium thereon, would they, after notice that the defendants intended to close their account, and their pass-book had been left for that purpose several days previous, have *paid such balance until a settlement had been made for the premium ?*

X. *As to the measure of damages,* if the court believes the plaintiff can recover at all, we say it should be the price of the gold at the time of delivery ; certainly it could not be in excess of the amount claimed in their complaint, to wit, $7200. *The act of congress, passed February 25, 1862,* making certain treasury notes of the United States a legal tender in payment of debts between private persons, is constitutional and valid. (*Metropolitan Bank* v. *Van Dyck,* 27 *N. Y. Rep.* 400. *Hague* v. *Powers,* 39 *Barb.* 427. *Roosevelt* v. *Bull's Head Bank,* 45 *id.* 579. *Kimpton* v. *Bronson, Id.* 618.) No doubt can now be entertained as to the validity or effect of payment, or tender of payment, in the currency commonly called " *legal tender notes,*" issued under and by virtue of the law of congress, February 25, 1862. (*Vol.* 12, *U. S. Stat. at Large, p.* 711.) This act has made such notes lawful money, and a legal tender in payment of all debts, public and private, within the United States. It has been held that a contract for the payment of a sum in gold and silver dollars is satisfied by payment in such *legal tender notes.* (*Wilson* v. *Morgan,* 1 *Abb. Pr. N. S.* 174. *Kimpton* v. *Bronson,* 45 *Barb.* 618.) Congress, by the passage of that act, has made a paper dollar the equivalent of a gold or silver dollar. That act has left nothing to the discretion of courts ; it has rendered such currency nominally, for all legal purposes, equal to gold, and *in legal contemplation no difference exist between them.* (*Wilson* v. *Morgan,*

Bank of the Commonwealth *v.* Van Vleck.

1 *Abb. Pr. N. S.* 174.) It has been held that a charter-party, made in a foreign country, stipulating for the payment of the freight in gold, on the discharge of the cargo in the United States, could be paid in legal tender notes. A bond and mortgage, with a condition that the same shall be paid in "*gold or silver coin,*" can be discharged and paid by such notes or currency, as it is only a debt. (5 *Wend.* 394. 3 *Conn. Rep.* 58. 3 *Bosw.* 181. 2 *Cranch,* 10. 16 *Iowa Rep.* 244. 10 *Am. Law Reg.* 553.)

The plaintiffs claim that they lent the $10,000 in gold coin to the defendants, and admit that they took a memorandum for the same, and that fifteen minutes after such delivery they (the plaintiffs) received $10,000 in legal tender notes, and surrendered up the memorandum; we say, as matter of law, the loaning of said $10,000 coin created a debt only as between the parties, and the subsequent reception of $10,000 of legal tender notes discharged such indebtedness, and has thus deprived the plaintiffs of any cause or right of action. The subsequent promises of Van Vleck, one of the defendants, that he or his firm would adjust and pay the differences on said gold loan, can have no weight in creating an indebtedness as against said firm for the premium on said gold coin, if the debt created by such loan had already been satisfied by the payment or delivery of the legal tender notes to the plaintiffs. (*See Mendlebourn et al.* v. *The People of the United States, N. Y. Times, Jan.* 27, 1867, *Sup. Court U. S.*; *Thompson* v. *Riggs, same court, May,* 1867.) The case of *Thompson* v. *Riggs,* (*supra,*) was to recover a coin deposit. The defendant was discharged upon the payment of an equal amount of treasury notes. A special contract to repay in gold was not proved in the case before the court, although it was assumed that such was the custom when gold deposits were made.

CLERKE, J. The judge, at special term, has found, as a matter of fact, that the plaintiffs loaned to the defendants

ten thousand dollars in gold ; that the defendants agreed to repay this loan in gold ; and that they have repeatedly since the loan promised to return gold to that amount, but that they have never done so.

Does the act of congress, commonly called the legal tender act, apply to this transaction ?

In *Rodes* v. *Bronson*, (34 *N. Y. Rep.* 649,) it was held that an obligation contained in a mortgage, executed the 16th of December, 1851, that the mortgagors would pay $1400, on the 1st of January, 1857, " in gold or silver coin, lawful money of the United States," may be satisfied in United States legal tender notes ; the grantee of the mortgaged property having tendered to the defendant, on the 10th of January, 1865, in payment of the mortgage, United States treasury notes of an equivalent denomination. When the mortgage in that case was executed, gold and silver constituted the legal currency, and the only legal currency, of the United States ; and it would have been considered a most monstrous and chimerical idea, at that happy period, to suppose that any other material would be substituted in their place by the national legislature. That, indeed, were a calamity deemed so demoralizing, so disorganizing, so fatal to financial and commercial stability, that the most desponding or despairing would not venture to predict it. But this calamity has fallen upon us ; and while gold and silver then alone constituted the currency of the United States, treasury notes now alone constitute it, and alone constituted it, when the tender was made in the case of *Rodes* v. *Bronson.* The obligation in that case was, in fact, to pay " in lawful money of the United States," the words " in gold or silver coin," being deemed mere surplusage. The gist of the promise was, that the debt should be satisfied with whatever might be lawful money of the United States at the time it should become payable. By the acts of congress, passed on the 25th February and 11th July, 1862, United States treasury notes were, in effect, declared to be the only lawful currency of the

nation; they were, as I have said, substituted as such, for what had ever been before, since the adoption of the federal constitution, regarded as the only lawful currency. The provisions of these acts, making treasury notes lawful money, and legal tender in payment of debts, have been solemnly pronounced by the highest court of appellate jurisdiction in this state valid, and in all respects in perfect accord and harmony with the federal constitution. Never before had it been disputed that the obligations of a debtor to his creditor were inviolable, except when the former took shelter under laws regulating bankruptcy or insolvency. The constitution itself, in the section containing the restrictions and prohibitions upon the authority of the states, plainly shows that those obligations were so regarded by its framers; but these acts compel creditors, who were thus entitled to payment in gold and silver coin, to accept, in lieu thereof, paper promises at some indefinite time in the distant future. It may, therefore, be contended with some semblance of plausibility, that the effect of this was nothing more or less than confiscation; confiscation of one half, one third, or the one fourth of vested rights, or whatever proportion it might be, according to the varying value of the paper promises at the time of payment. That high tribunal, however, has decreed that the acts authorizing these wholesale confiscations are necessary and proper for carrying into execution some of the enumerated powers delegated by the states to congress, such as the power to borrow money and to regulate commerce. I am uncertain whether a very startling proposition, urged (dare we say *argued?*) with recondite zeal by one of the counsel of the successful party, has been adopted or repudiated by the court; namely, that the issuing of promises to pay money at an indefinite period, engraved on small pieces of colored paper, is the exercise of the power to "coin money" under the constitution. (*See art. 1, § 8, sub. 5.*) That is to say, a promise to pay money (which refers to the future) is the coining of money (which refers and appertains to the present.)

Although the question has not been settled by the Supreme Court of the United States, we are of course bound to follow these decisions, in whatever degree they may shock our well-matured and long cherished convictions. None of them, however, in my opinion, affect the case before us. Paper promises having been substituted as the national currency in the place of gold and silver, the latter have disappeared as currency; they no longer possess the functions of national instruments of exchange; and they have become, whatever may be their form, whether in bullion or in coin, merely articles of commerce, having the same characteristics, and being liable to the same legal disposition as other articles of commerce, when they are the subject matter of a contract. Therefore, since the passage of the acts of 1862, when a person promises, for any valid consideration, to return gold or silver, instead of the national currency, he is bound to return those specific things, precisely as he would be bound to return a specific quantity and quality of cotton, if he had promised to do so for a valid consideration. There can be no possible difference; the fact that the one commodity at a former time constituted the legal currency, is no reason why it should be regarded in a different light from other commodities when it is no longer recognized or employed in that capacity. No one would hesitate, for a moment, to declare what the obligations of the defendants were, if instead of gold they borrowed cotton, and promised to return the same commodity of equal quantity and quality; and I presume there would be as little hesitation, if, in the present case, instead of indicating the quantity and quality of the gold lent and the gold to be returned, by employing the word "dollars," they mentioned gold of a specific weight to indicate the quantity; and of a certain proportion of alloy, or number of carat grains, to indicate the quality, or that it should be what, in the trade, is called jewelers' gold, or mosaic gold. But, surely, the employment of the word "dollars" can make no difference in the face of the manifest intent of the contracting parties. The word was obviously

Bank of the Commonwealth *v.* Van Vleck.

employed merely for the purpose of signifying the quantity and the quality of the article lent and to be returned. At the time of the transaction, it was notorious that the word dollar in paper, was a very different thing from what it was in gold; and we all know, by sad daily experience, that the difference soon greatly increased, and that it is great even now. Thus the defendants promised to do something different from paying an ordinary debt; they promised to return to the plaintiffs gold of the same quantity and quality as that which they received from them; and the character of the promise is, in no respect, altered by their employment of the word "dollars," to designate the quantity and quality, instead of stating the specified weight, and specified proportions of alloy, or specified carat grain; as they would have done, if the gold borrowed was in the form of bullion instead of coin. The plaintiffs, therefore, are entitled to damages for breach of this contract, unless they have expressly, or impliedly, released the defendants from its obligation.

II. Have the plaintiffs done this?

The judge holds, as a matter of fact, that on the 9th of December, 1863, the defendants directed the plaintiffs to write up the bank book, with a view to close their account, having previously found that on the 1st of September, a few minutes after the loan of the gold to the defendants, they delivered to the plaintiffs their check for $10,000; that the plaintiffs received the money for said check in legal tender notes; that the check was credited to the defendants in the general account which they kept with the bank, and on closing this account a balance of about $700 was found to be due to the defendants, which the plaintiffs paid. He finds, also, that the accounts so settled were made up exclusively of the defendants' deposits on one side, and the drafts against these deposits on the other, and did not include any charge of gold or premium as sold to the defendants. The check of $10,000 was received as a deposit, like any other deposit, and, as we have seen, was credited, like any other, to the defendants.

He also finds, that after the payment of the balance due to the defendants on the bank account, the cashier demanded the return of the gold, and the defendants promised to return it, and that the plaintiffs did not intend, by receiving the check for $10,000, to satisfy or discharge the defendants' obligation under the contract, by which the gold was borrowed.

Consequently, there was no release, and if I am right in concluding that the defendants are bound by the contract to return $10,000 in gold, the judgment should be reversed, and a new trial ordered, costs to abide the event.

LEONARD, P. J. concurred.

WELLES, J. dissented.

New trial granted.

[NEW YORK GENERAL TERM, June 3, 1867. *Leonard, Clerke* and *Welles,* Justices.]